IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JENNA OCKFORD & JUSTIN HERBST | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ENCOMPASS INSURANCE CO. | : | NO.  24-1581 |

## MEMORANDUM AND ORDER

ELIZABETH T. HEY, U.S.M.J.                                                April 4, 2025

Defendant has filed a motion for partial summary judgment, seeking judgment in its favor on both Ms. Ockford's and Mr. Herbst's ("Plaintiffs") bad faith claims in this underinsured motorist coverage ("UIM") case.  Doc. 37-1.  Plaintiffs respond that Defendant acted unreasonably in making settlement offers that were not reasonably related to Plaintiffs' losses, supporting the claims for bad faith.  Doc. 42.

## I.    FACTS

On December 16, 2022, Plaintiffs, while walking across the street at Centre Avenue and State Street in Newtown, Pennsylvania, were struck by a car.  Complaint ("Compl.") ¶ 4 (Doc. 1-4); Defendant's Concise Statement of Undisputed Material Facts ("DSMF") ¶ 1 (Doc. 39).[1]  The tortfeasor maintained liability limits of $25,000.  DSMF ¶ 29.  Plaintiffs were insured by an automobile policy issued by Defendant, which

---

[1]Plaintiffs do not dispute any of the statements of fact in DSMF except as noted. See Opposition to Defendant Encompass's Statement of Material Facts Not in Dispute. Doc. 40.

provided $100,000 per person in UIM coverage, stacked by two vehicles on the policy for a total of $200,000 per person in UIM benefits.  DSMF ¶ 3.

Plaintiffs reported the accident to Defendant on December 22, 2022, and Defendant opened a UIM claim on January 3, 2023.  DSMF ¶¶ 6, 7.  Beginning on January 9, 2023, Defendant's assigned representative, Shonda Campbell, periodically contacted Plaintiffs' counsel for information concerning Plaintiffs' injuries, treatment, treatment plans, wage loss, and photographs.  Id. ¶¶ 18 (Jan. 9, 2023), 19 (Jan. 13, 2023), 20 (Jan. 16, 2023), 22 & 23 (Feb. 16, 2023), 24 (Mar. 16, 2023), 28 (May 2, 2023), 30 (May 31, 2023), 31 & 32 (July 7, 2023), 34 (Aug. 17, 2023), 35 (Sept. 18, 2023).[2]

In response to these inquiries, Plaintiffs' counsel's paralegal advised Ms. Campbell on July 18, 2023, that Plaintiffs were still treating without providing any details of injuries.  DSMF ¶ 33.  On September 18, 2023, the paralegal again advised that Plaintiffs were still treating, and stated that Ms. Ockford sustained a non-surgical elbow fracture and was treating with a chiropractor for lumbar symptoms, and Mr. Herbst sustained non-surgical head and neck injuries and the paralegal was unsure if Mr. Herbst was still treating.  Id. ¶¶ 35-37.

On October 24, 2023, Plaintiffs' counsel emailed Ms. Campbell requesting consent to settle the bodily injury claims against the tortfeasor for the tortfeasor's policy limits of $25,000 per person.  DSMF ¶ 38.  On November 1, 2023, after obtaining the

---

[2]Ms. Campbell also contacted the tortfeasor's insurance carrier, to ascertain the tortfeasor's liability limits.  DSMF ¶ 21 (Jan. 16, 2023), 25 (Mar. 23, 2023), 26 & 27 (May 2, 2023).  On May 15, 2023, the carrier advised Ms. Campbell that their liability limits were $25,000 per person.  Id. ¶ 29.

police report and a background check on the tortfeasor, Ms. Campbell consented to the settlement with the tortfeasor. Id. ¶¶ 38-42.[3]  Ms. Campbell also asked Plaintiffs' counsel for a copy of the demand documentation provided to the tortfeasor's carrier so she could evaluate Plaintiffs' claim, which counsel's office said would be provided shortly. Id. ¶¶ 43, 44.  On December 5, 2023, Ms. Campbell again emailed Plaintiffs' counsel requesting the demand documentation that had been provided to the other carrier. Id. ¶ 45.  On December 7, 2023, Ms. Campbell received medical records from Plaintiffs' counsel and was informed that further records would be provided upon receipt. Id. ¶ 46.

Included in the records provided by Plaintiffs' counsel on December 7, 2023, were records from St. Mary's Medical Center, where Plaintiffs were taken after the accident. The records showed, as to Ms. Ockford, a CT scan showing a closed fracture of her fourth lumbar vertebrae, December 28, 2022 treatment records from orthopedist Stephen S. Cairone, D.O., including an elbow x-ray, and treatment notes from five chiropractic visits with Jennifer Grozalis, D.C., in April 2023; and as to Mr. Herbst, CT scans showing subdural hematomas and a right occipital skull fracture, a later CT scan showing a new hemorrhagic contusion in the left and right frontal lobes, and CT scans of his cervical spine showing mild multilevel central disc herniations at C3/4 – C6/7.  Plaintiffs' Statement of Material Facts ("PSMF") ¶¶ 1, 2 (Doc. 41); see also Doc. 41-1, 41-2

---

[3]Plaintiffs' opposition to DSMF ¶ 42 is non-responsive.  Doc. 40 ¶ 42 (referring not to consent to settle but to background check on Plaintiffs).  I take the statement of fact in DSMF ¶ 42 to be admitted.

(medical records provided); Doc. 38-3 at 49-50 (Ms. Campbell's evaluation of the treatment notes).

Based on the medical evidence provided, Ms. Campbell valued Mr. Herbst's claim at $35,000 to $58,000, and subtracted the tortfeasor's payment for a valuation of $10,000 to $33,000.  DSMF ¶¶ 52-53; Doc. 38-3 at 49.  With respect to Ms. Ockford, Ms. Campbell valued the claim at $24,100 to $41,000, and subtracted the tortfeasor's payment for a valuation of $0 to $16,100.  DSMF ¶¶ 49-51; Doc. 38-3 at 49-50.  On December 11, 2023, Ms. Campbell offered to resolve Plaintiffs' UIM claims at $10,000 for Mr. Herbst and $3,000 for Ms. Ockford.  DSMF ¶¶ 54-55; PSMF ¶ 3.

On January 24, 2024, Plaintiffs' counsel forwarded a medical report from a neuroradiologist who confirmed that Ms. Ockford sustained a left elbow fracture.  DSMF ¶ 56; Doc. 38-3 at 47.  Based on the new evidence and evidence of medical liens, Ms. Campbell revised her evaluations, valuing Mr. Herbst claim at $34,000-$57,000 after the $25,000 credit, and valuing Ms. Ockford's claim at $18,000 - $44,000 after the $25,000 credit.  DSMF ¶ 56-62.  Ms. Campbell offered $34,000 for resolution of Mr. Herbst's claim and $18,000 for Ms. Ockford's case.  DSMF ¶ 63; PSMF ¶ 11; Doc. 41-10.

On March 14, 2024, Plaintiffs' counsel forwarded additional medical records and wage loss information, demanded the policy limits of $200,000 for each Plaintiff, and advised Ms. Campbell that if the matter was not resolved before March 27, 2024, he would be filing suit.  DSMF ¶¶ 66-68; PSMF ¶ 12; Doc. 41-11.[4]  Based on this

---

[4]The evidence forwarded related to treatment and a medical lien of $23,701.92 for Mr. Herbst, and Ms. Ockford's wage loss.  Doc. 41-11.

information, Ms. Campbell valued Ms. Ockford's claim at $32,500 - $58,500, and Mr.

Herbst's at $91,000 - $127,000, after application of the tortfeasor credit.  PSMF ¶ 16;

DSMF ¶¶ 71-72.  Ms. Campbell offered to settle Ms. Ockford's claim for $ 32,500, and

Mr. Herbst's claim for $ 91,000.  PSMF ¶ 15; DSMF ¶¶ 73, 74; Doc. 41-12.[5]  On January

13, 2025, while this litigation was pending, the parties resolved Mr. Herbst's UIM claim.

DSMF ¶ 78.

　　　　Plaintiffs filed suit in state court on April 3, 2024, claiming breach of contract

(Counts I to III) and bad faith (Counts IV and V), Compl., and Defendant removed the

case to federal court.  Doc. 1.  Defendant has filed a motion for summary judgment on the

bad faith claims, arguing that there is no evidence that it lacked a reasonable basis for the

handling of Plaintiffs' claims or that Defendant knew of or recklessly disregarded the

lack of any reasonable basis.  Doc. 37-1.  Plaintiffs respond that genuine issues of

material fact exist regarding the reasonableness of Defendant's conduct, based on their

characterization of Defendant's conduct as arbitrary throughout, and in particular

focusing on the difference between initial and subsequent offers Defendant made to each

Plaintiff.  Doc. 42.

## II.　　STANDARD OF REVIEW

　　　　A moving party is entitled to summary judgment "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[5]In her letter, Ms. Campbell advised Plaintiffs' counsel that Defendant may ask for
an Examination Under Oath and Independent Medical Examinations to aid Defendant's
evaluation.  Doc. 41-12.

matter of law.  Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).[6]  A factual dispute is "material" if it might affect

the outcome of the case under governing law.  Id.

      "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record . . .  or showing that

the materials cited do not establish the absence or presence of a genuine dispute . . . ."

Fed. R. Civ. P. 56(c)(1)(A), (B).  "Speculation, conclusory allegations, and mere denials

are insufficient to raise genuine issues of material fact."  Boykins v. Lucent Techs., Inc.,

78 F. Supp.2d 402, 408 (E.D. Pa. 2000).  The evidence presented must be viewed in the

light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.

      On summary judgment, it is not the court's role to weigh the disputed evidence,

decide which is more probative, or make credibility determinations.  Boyle v. Cnty. of

Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v.

Darling-Delaware Co., 998 F.2s 1224, 1240 (3d Cir. 1993)).  Rather, the court must

consider the evidence and all reasonable inferences which may be drawn from it, "in the

light most favorable to the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 487 (1986) (quoting United States v. Diebold, Inc., 369 U.S.

654, 655 (1962)).  If a conflict arises between the evidence presented by the parties, the

---

[6]Anderson predated the 2010 Amendment to Rule 56.  However, the change in
wording and location within the rule for the summary judgment standard did not alter the
standard or caselaw interpretation of the standard.  Fed. R. Civ. P. 56 advisory
committee's note to 2010 Amendments.

court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in [their] favor."  <u>Anderson</u>, 477 U.S. at 255.

## III.    <u>DISCUSSION</u>

Plaintiffs state their bad faiths claim pursuant to 42 Pa. C.S.A. ¶ 8371, providing for damages in the case of an insurer's actions in bad faith toward its insured.  Compl. ¶¶ 27, 32.  "In order to recover under a bad faith claim under Pennsylvania statutory law, a plaintiff must show (1) that the defendant did not have a reasonable basis for denying benefits under the policy; and (2) that the defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim."  <u>Kleinz v. Unitrin Auto & Home Ins. Co.</u>, Civ. No. 19-1426, 2020 WL 7263548, at *8 (W.D. Pa. Dec. 10, 2020) (citing <u>Rancosky v. Washington Nat'l Ins. Co.</u>, 170 A.3d 364, 365 (Pa. 2017)).  The statute does not define "bad faith," but the Pennsylvania Supreme Court has defined bad faith to be "any frivolous or unfounded refusal to pay proceeds of a policy[.]"  <u>Rancosky</u>, 170 A.3d at 373 (quoting <u>Terletsky v. Prudential Prop. & Cas. Ins. Co.</u>, 649 A.2d 680, 688 (Pa. Super. 1994)).

> Bad faith "must be proven by clear and convincing evidence and not merely insinuated."  <u>Terletsky</u>, 649 A.2d at 288 (collecting cases).  . . .  [T]his heightened standard requires the insured to provide evidence "so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith."  <u>Bostick v. ITT Hartford Grp.</u>, 56 F. Supp.2d 580, 587 (E.D. Pa. 1999) (citations omitted).  In deciding a motion for summary judgment, a court "must view the evidence presented in light of the [insured's] substantive burden at trial.  <u>Northwestern Mut. Life Ins. Co. v. Babayan</u>, 430 F.3d 121, 137 (3d Cir. 2005) (citations omitted).

7

Kleinz, 2020 WL 7263548, at *8 (quoting Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167,

179 (3d Cir. 2011)). "[A]ll that is needed to defeat a claim of bad faith . . . is evidence of

a reasonable basis for the insurer's actions or inaction." Coleman v. Foremost Ins. Co.,

Civ. No. 19-749, 2023 WL 2602514, at *12 (M.D. Pa. Mar. 22, 2023) (quoting Gibson v.

State Farm Mut. Auto. Ins. Co., 994 F.3d 182, 191 (3d Cir. 2021) (in turn citing J.C.

Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 367 (3d Cir. 2004))).

    Defendant argues that it is entitled to summary judgment on the bad faith claims

because there is no evidence that it lacked a reasonable basis for its handling of Plaintiffs'

claims. Doc. 37-1. Plaintiffs respond that genuine issues of material fact exist regarding

the reasonableness of specific actions Defendant took in handling Plaintiffs' claims,

including: (1) Defendant's initial lowball settlement offers, (2) offering the lowest

amount in every value range, (3) arbitrarily increasing offers without justification, (4) the

failure to obtain any medical opinion or an independent medical examination ("IME") to

determine the nature and extent of Plaintiffs' injuries, (5) the failure to perform any

research regarding the value of similar cases, and (6) providing no value for Ms.

Ockford's lumbar herniated disc. Doc. 42.

    A.    Lowball Offers and Offers at the Low End of the Valuation

    Plaintiffs first argue that there is a genuine issue of material fact regarding the

reasonableness of Defendant's settlement offers, complaining that Defendant

"intentionally lowballed" its offers to settle the claims. Doc. 42 at 7-10. The argument is

actually two-fold; first that Defendant failed to properly assess the value of the claims in

light of Plaintiffs' injuries, and second that Defendant consistently offered the lower end

of its value range.

Starting with the initial offers, Plaintiffs characterize the initial offers of $3,000 for

Ms. Ockford and $10,000 for Mr. Herbst as "highly unreasonable" in light of the injuries

each Plaintiff sustained.  Doc. 42 at 3-5.  Defendant responds that it evaluated Plaintiffs'

claims based upon the information available at the time and made appropriate offers.

Doc. 37-1 at 14.

Although "low-ball offers which bear no reasonable relationship to an insured's

actual losses can constitute bad faith," "[g]enerally Pennsylvania law does not treat as

bad faith an insurer's low but reasonable estimate of an insured's losses."  Stewart v.

GEICO Ins., Civ. No. 18-791, 2020 WL 822053, at *3 (W.D. Pa. Feb. 19, 2020) (quoting

Seto v. State Farm Ins. Co., 855 F. Supp.2d 424, 430 (W.D. Pa. 2012)); see also Kleinz,

2020 WL 7263548, at *8 ("neither an insured's disagreement with the amount offered on

a UIM claim nor a citation to negligent mistakes made by the insurer in handling the

claim is sufficient to demonstrate bad faith").

Plaintiffs maintain that the amounts initially offered were unreasonable in light of

the injuries each sustained.[7]  Doc. 42 at 8-9.  Specifically, Plaintiffs argue that a $3,000

offer for Ms. Ockford's spinal and elbow fractures was unreasonable, as was a $10,000

offer for Mr. Herbst's head and spinal injuries.  However, at the time Defendant made the

_____

[7]Although Plaintiffs' counsel nominally acknowledges that Defendant "does
received a credit for the underlying settlement of $25,000 per plaintiff," Doc. 42 at 3 n.1,
counsel neglects to take this into account in pressing the issue of unreasonable offers.

initial offers in December 2023, the only records that had been provided as to Ms.

Ockford were the emergency room records, a follow-up orthopedist appointment, and

five chiropractic visits in April 2023.[8]  Doc. 38-3 at 48-50 (Ms. Campbell's notes).

Considering this evidence, Ms. Campbell valued Ms. Ockford's claim at $23,000 -

$40,000 and deducted the amount received from the tortfeasor's insurance in making an

offer of $3,000.  Id. at 49-50.  At that time, as for Mr. Herbst, the records provided

established that he sustained a fracture to the right occipital bone, cerebral contusions, a

brief loss of consciousness, a trace subdural hemorrhage, scalp abrasion, mild multilevel

central disc herniation at C3/4 – C6-7, mild left foraminal stenosis at C5/6 and C6/7.

Doc. 38-3 at 49-50; Doc. 41-1, 41-2 (medical records provided).  Ms. Campbell assessed

the value of the injuries at $35,000 - $58,000, and reduced that figure by the amount

received from the tortfeasor in offering $10,000.  Doc. 38-3 at 49-50.  The notes indicate

that Plaintiffs' counsel was trying to get additional treatment records and figures

regarding wage loss for both Plaintiffs and Ms. Campbell indicated that her evaluation

could change upon the receipt of additional information.  Id.

     Because the records provided in December 2023 failed to show any ongoing

treatment for Mr. Herbst and chiropractic treatment which ended in April 2023 for Ms.

Ockford, Ms. Campbell had a reasonable basis for her valuation.  At that point,

---

[8]The records contained in the December 2023 submission do not clarify whether Ms. Ockford had an elbow fracture.  The emergency room records do not contain that diagnosis.  On December 28, 2022, Dr. Cairone x-rayed Ms. Ockford's left elbow during the follow-up orthopedist visit.  Doc. 41-1 at 9.  But in his assessment, the doctor only mentions "a self-limiting fracture of the transverse process of L4," and advised Ms. Ockford that "it will heal on its own."  Id. at 10.

Defendant had no evidence that Plaintiffs' symptoms continued beyond what the treatment notes established. Plaintiffs have failed to establish by clear and convincing evidence that the amounts originally offered were unreasonable.

Similarly, the fact that Defendant's offers were at the lowest end of its value ranges does not rise to the level of bad faith so long as the determination was reasonable. See Murphy v. United Fin. Cas. Co., Civ. No. 15-4199, 2016 WL 1555926, at *4 (E.D. Pa. Apr. 18, 2016) (granting summary judgment for insurer on bad faith claim based on insurer's offer at bottom of the reasonable valuation range); Thorner v. Allstate Ins. Co., 790 F. Supp.2d 360, 375-76 (E.D. Pa. 2011) (granting summary judgment to insurer when offer was $5,000 less than insurer's valuation); Kosierowski v. Allstate Ins. Co., 51 F. Supp.2d 583, 592 (E.D. Pa. 1999) ("The court . . . rejects the idea that negotiation – i.e., offering the bottom of an estimated settlement range – qualifies as bad faith.").

Plaintiffs' reliance on McCrory v. State Farm Mutual Automobile Insurance Co., Civ. No. 07-39, 2008 WL 939189 (W.D. Pa. Apr. 7, 2008), is inapposite. In McCrory, the court found that a reasonable juror could conclude that the insurer acted in bad faith where the insurer refused to assign a value to the claim because it did not know the amount of coverage, and at the same time the claims representative noted in the file that the medical costs exceeded $250,000 and lost earnings were nearly $600,000, he wrote to the plaintiff's counsel that the claim did not exceed $200,000 in value. Id. at *3. Here, there is no evidence of such blatant undervaluation in the face of medical bills and wage loss evidence, and there is no dispute that Defendant was assigning values to the claims. Viewed in the light most favorable to them, Plaintiffs have failed to establish by clear and

convincing evidence that Defendant did not have a reasonable basis for the offers to settle the UIM claims.

      B.      <u>Arbitrarily Increasing Offers</u>

Plaintiffs next argue that Defendant's increasing offers, despite no significant changes in Plaintiffs' medical conditions, and the arbitrariness of its increases, support a finding of bad faith. Doc. 42 at 4, 8-9, 14, 18. Defendant asserts that it reevaluated the claims as it received more information and made new offers based on the reevaluations. Doc. 37-1 at 14.

Plaintiffs' argument focuses on the increases from the initial offers of $3,000 and $10,000 for Ms. Ockford and Mr. Herbst, respectively, to $32,500 and $91,000, respectively. Doc. 42 at 18.[9] Plaintiffs argue that that Defendant "increased the offers arbitrarily, without any additional medical problems or any additional medical or health complications." <u>Id.</u> Plaintiffs rely on <u>Barry v. Ohio Casualty Group</u>, wherein the insurer increased its offer from $6,000 to $25,000 in a two week period in the absence of any additional evidence, did not thoroughly investigate the claim, and utilized other dilatory tactics to delay payment of a valid claim. Civ. No. 04-188, 2007 WL 128878, at *8 (W.D. Pa. Jan. 12, 2007). The court found that the plaintiff's allegations of bad faith

_____

[9]Plaintiffs also point to the magnitude of the increases in this case compared with some of the cases relied on by Defendants. Doc. 42 at 10-12 (chart displaying increases in seven cases and this case). In performing the calculations, however, Plaintiffs make two critical errors. First, they ignore credit for the tortfeasor's payments, and second, they rely on post-litigation offers. With the credit, and based on the last pre-litigation offers, the offers for Ms. Ockford increased from $28,000 to $57,500, and the offers for Mr. Herbst increased from $35,000 to $116,000. The magnitude of these increases is not out of line with those in Plaintiffs' chart.

throughout the claims-handling process was sufficient to deny summary judgment.  Id. at *13.  Similarly, in Wisinski v. American Commerce Group, Inc., upon which Plaintiffs rely, the court found in favor of the plaintiff on a bad faith claim when a combination of actions established bad faith on the part of the insurer in handling the plaintiff's UIM claim, including; misrepresentation of the UIM coverage limits ($50,000 rather than $100,000), making an offer of $9,000 in the face of medical evidence establishing the relationship between the accident and the plaintiff's need for bilateral total knee replacements and medical bills in excess of $50,000, refusing to arbitrate the claim as required by the policy, and increasing the offer in increments absent any intervening medical information as the arbitration approached, ultimately offering $100,000 pre-arbitration.  Civ. No. 07-346, 2011 WL 13744, at *16-19 (W.D. Pa. Jan. 4, 2011).

Unlike in Barry and Wisninski, where there was no precipitating event to explain the increased offers, Defendant increased the offers when it received additional information involving Plaintiffs' medical treatment or wage losses.  Plaintiffs focus on the fact that their diagnoses did not change, but ignore that the subsequently provided evidence established continuing symptoms and treatment relevant to the value of the claim.

The evidence establishes that as she received additional records, Ms. Campbell revised the valuation of the claims and made offers accordingly.  See, e.g., Doc. 38-3 at 47 (1/24/24 – receipt of report confirming elbow fracture, 1/30/24 – Ms. Campbell revised the value of Ms. Ockford's claim and offered $18,000), 46-47 (1/24/24 – received billing information for Mr. Herbst, 1/30/24 – Ms. Campbell revised the value of Mr.

Herbst's claim and offered $34,000); Doc. 41-11 (3/13/24 – correspondence from Plaintiffs' counsel including additional neurology records for Mr. Herbst and wage loss information for Ms. Ockford); Doc. 38-3 at 42-43 (3/21/24 – Ms. Campbell increased the offer to $32,500 for Ms. Ockford and $91,000 for Mr. Herbst).  Plaintiffs argue that the increases were arbitrary because there was no evidence of any additional injuries.  Doc. 42 at 18.  However, the additional information provided established that Plaintiffs continued having symptoms and ongoing treatment for their injuries, confirmed the fracture of Ms. Ockford's elbow, and supported Ms. Ockford's claim for lost wages.  Rather than arbitrary, the increases were directly related to additional information regarding ongoing medical treatment, medical bills, or lost wages.

Plaintiffs also rely on the reserves set on Ms. Ockford's claim ($88,500) to argue that Defendant's offers were unreasonable.  Doc. 42 at 9-10.  "An insurance reserve is money set aside 'to satisfy obligations that may arise under a claim.'"  Stewart v. GEICO Ins., Civ. No. 18-791, 2020 WL 822053, at *4 (W.D. Pa. Feb. 19, 2020) (quoting Peco Energy Co. v. Ins. Co. of N. Am., 852 A.2d 1230, 1232 n.3 (Pa. Super. 2004)).  However, "the fact that [a] settlement offer . . . was less than the . . . reserves is not evidence of bad faith."  Kleinz, 2020 WL 7263548, at *9; see also Stewart, 2020 WL 822053, at *4 ("the failure of a carrier to offer its full settlement authority does not constitute bad faith"); Schifino v. Geico Gen. Ins. Co., Civ No. 11-1094, 2013 WL 6533180, at *19 (W.D. Pa. Dec. 13, 2013) (Plaintiff failed to establish bad faith where insurer failed to offer the reserves); Williams v. Hartford Cas. Ins. Co., 83 F. Supp.2d 567, 575-76 (E.D. Pa. 2000) ("the setting of reserves is an estimate of an insurer's exposure under a claim . . .  [but]

14

the court is reluctant to fashion a rule requiring an insurer to make an offer reflecting the reserve as soon as it is set"). Thus, the fact that Defendant's offers were below the reserves does not establish bad faith.

C. <u>Failure to Engage Medical Professionals, Conduct an IME, or Other Research</u>

Plaintiffs next argue that Defendant's failure to engage medical professionals to perform IMEs prior to litigation to better understand the values of Plaintiffs' injuries is another indicator of bad faith. Doc. 42 at 17. Plaintiffs concede that such failure is not bad faith if considered in a vacuum, but should be considered in analyzing Defendant's actions. <u>Id.</u> Defendant does not address this argument in its reply.

"Both federal and Pennsylvania courts have indicated that failure to timely obtain an IME is probative of bad faith." <u>Baum v. Metro. Prop. & Cas. Ins. Co.</u>, Civ. No. 16-623, 2019 WL 4689024, at *5 (W.D. Pa. Sept. 26, 2019) (citing <u>Parisi v. State Farm Mut. Auto. Ins. Co.</u>, Civ. No. 16-179, 2018 WL 2107774, at *14 (W.D Pa. May 7, 2018); <u>Bonenberger v. Nationwide Mut. Ins. Co.</u>, 791 A.2d 378, 379-81 (Pa. Super. 2002); <u>Hollock v. Erie Ins. Exch.</u>, 54 Pa. D&C.4th 449, 513 (Pa. Ct. Com. Pl. 2002)). In this case, however, Defendant had little, if any, time to schedule an IME or examination under oath and the benefit of such reviews was questionable considering the dearth of medical evidence provided to Defendant.

On December 7, 2023 -- after eleven months of Ms. Campbell's requests for medical records (including multiple requests for the documentation provided to the tortfeasor's insurance carrier) to allow her to evaluate the UIM claims, and being advised

that Plaintiffs were still treating for their injuries, see DSMF ¶¶ 19-45 (communications requesting information from Jan. 13 to Dec. 5, 2023) -- Defendant first received the emergency room records (including CT scans of Mr. Herbst's skull/brain and cervical spine, and Ms. Ockford's lumbar spine), Ms. Ockford's December 28, 2022 orthopedic treatment records including an elbow x-ray, and Ms. Oxford's treatment notes from five chiropractic visits in April 2023.  PSMF ¶¶ 1, 2; see also Docs. 41-1, 41-2 (medical records provided).  When Ms. Campbell extended the initial offer, she prefaced it with "I am aware you are still collecting documentation," and stated that she would reevaluate as more information was provided.  Doc. 39-6 (Dec. 11, 2023 email).

Thereafter, on January 24, 2024, when Ms. Campbell received additional medical reports and lien documentation, she reassessed the claims and revised the offers, and asked counsel to "forward any additional information for consideration."  Doc. 38-3 at 46-47 (claim notes dated Jan. 30, 2024); Doc. 39-7.  On March 14, 2024, Plaintiffs provided additional medical records from Mr. Herbst's neurologist and primary care physician, along with documentation supporting Ms. Ockford's wage loss.  Doc. 41-11 at 3.  In that letter, Plaintiffs' counsel demanded the policy limits for each Plaintiff and advised that he would be filing suit if the matter was not resolved on or before March 27, 2024.  Id. at 4.  In response, Ms. Campbell made new offers based on the newly-produced evidence ($91,000 for Mr. Herbst and $32,500 for Ms. Ockford), and requested additional information including (1) treatment records for Mr. Herbst between January 10, 2023 and March 7, 2024, (2) treatment records for Ms. Ockford from April 25, 2023 to the present, (3) wage documentation for Mr. Herbst, and (4) copies of all radiological

reports and films.  Doc. 39-9.  At that point, Ms. Campbell indicated that Defendant may

request examinations under oath and IMEs "in the future to aide us in our evaluation."

Id.  Plaintiffs filed suit on April 3, 2024, without providing any additional information.

When asked about the failure to schedule IMEs, Jeremy Braud, a representative of

Defendant explained:

> I don't think an IME, based on emergency room records and a
> lien, would do much good for us.  It wouldn't be beneficial.  I
> mean, historically, in my career and my experience, after we
> have the full compendium of records that paints the picture of
> the claimants' injury, their life impact, the length of
> treatment, the type of treatment and the surgeries, the
> invasiveness of the treatment, all of those things that we look
> for, and there's still questions as to the recovery, certainly, we
> would consider an IME.  But at the stage that we're
> discussing now, we only had basic emergency room records
> and really had no information on the treatment or life impact.

Braud Dep. at 50 (Doc. 41-8 at 2); see id. at 117 (Doc. 41-9 at 4) ("I don't think it's

beneficial for either party to potentially start engaging experts when we know we don't

have a full compendium of records.").

Plaintiffs assert that "it is commonplace in every personal injury case to wait until

treatment is completed before ordering records."  Doc. 40 ¶ 33; see also id. ¶ 28.  But

Plaintiffs cannot have it both ways -- on the one hand delay in producing medical records

and on the other hand charge bad faith for the carrier's not making offers that meet

Plaintiffs' subjective sense of what is reasonable.  Considering the dearth of medical

evidence provided, the fact that two years after the accident Plaintiffs were providing

medical evidence from the month following the accident while, at the same time,

threatening suit, and Defendant's continued requests for updated medical and wage loss evidence, the failure to conduct IMEs falls far short of bad faith.

Plaintiffs also point to Defendant's failure to research the value of similar claims as evidence of bad faith, noting that "[a]n action for bad faith may extend to the insurer's investigative practices."  Doc. 42 at 17 (citing O'Donnell v. Allstate Ins. Co., 734 A.2d 901, 906 (Pa. Super. 1999)).  Although it is true that Ms. Campbell did not research other verdicts or settlements to determine the value of Plaintiffs' claims, Campbell Dep. at 96-97 (Doc. 41-9 at 2-3), as explained, Defendant was still requesting documentation to properly evaluate the claim.  Under the circumstances, Plaintiffs have failed to establish that the failure to conduct such research was unreasonable.

D.    Value for Lumbar Herniated Disc

Finally, as evidence of bad faith, Plaintiffs rely on Defendant's response to an expert report indicating that Ms. Ockford also suffered lumbar herniations as a result of the accident, as evidenced by a later-performed MRI.  Doc. 42 at 3, 18.  Plaintiffs refer to a March 3, 2025 letter (almost a year into the litigation) in which Defendant acknowledged "conflicting expert testimonies" as to whether Ms. Ockford suffered a herniation due to the accident, or only the L4 fracture.  Doc. 41-18.

A genuine disagreement between parties on causation or value is not sufficient to establish bad faith.  See Babato v. Progressive Spec. Ins. Co., Civ. No. 21-732, 2023 WL 2287646, at *5 (M.D. Pa. Feb. 28, 2023) ("it is well settled that genuinely disputing causation [of plaintiff's injuries] and value [of plaintiff's insurance claim] is not tantamount to bad faith") (quoting Castillo v. Progressive Ins. Co., Civ. No. 19-1628,

2021 WL 963478, at *6 (M.D. Pa. Mar. 15, 2021)); Faulkner v. Metro. Prop. & Cas. Ins. Co., Civ. No. 21-638, 2021 WL 12313058, at *1 (M.D. Pa. Aug. 11, 2021) (granting motion to dismiss bad faith claim where genuine disagreement regarding causation existed).  The letter at issue, referencing competing expert opinions, clearly falls into this category, and is not evidence of bad faith.

## IV.    CONCLUSION

Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that a reasonable finder of fact could not find that there is clear and convincing evidence of bad faith in Defendant's handling of Plaintiffs' claims.  Although Plaintiffs disagreed with Defendant's valuation of their claims throughout the process, such disagreement does not amount to bad faith.  "A reasonable basis is all that is required to defeat a claim of bad faith." Pilosi, 393 F.3d at 367 (citing Horowitz v. Fed. Kemper Life Ass. Co., 57 F.3d 300, 307 (3d Cir. 1995)).  Plaintiffs have not presented clear and convincing evidence that Defendant lacked such a reasonable basis for its handling of Plaintiff's claims.

An appropriate Order follows.